IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

VINCENT DOWLER,

                Plaintiff,           Case No. 3:13 CV 920

   -vs-

                                              <u>MEMORANDUM   OPINION</u>

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

KATZ, J.

      Vincent Dowler applied for social security disability insurance benefits and for supplemental security income benefits with the Social Security Administration. After exhausting his available administrative remedies, the Commissioner of Social Security denied Dowler's applications for benefits.

      Dowler then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge Nancy A. Vecchiarelli for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report recommending that this Court affirm the Commissioner's decision denying Dowler's applications for benefits. This matter is before the Court pursuant to Dowler's timely objections to the Magistrate Judge's report.

      The Court has jurisdiction over the Commissioner's final decision denying Dowler's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), this Court has made a de novo determination of the Magistrate Judge's report. For the reasons stated below, the Court adopts the report and affirms the Commissioner's decision denying Dowler's applications for social security disability insurance benefits and for supplemental security income benefits.

### I. Standard of Review

This Court conducts a de novo review of those portions of the Magistrate Judge's report to which Dowler objects. 28 U.S.C. § 636(b)(1). In so doing, this Court reviews the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g). This Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Court does not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if this Court would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted). The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Id*. at 854–55.

### II. Discussion

Because Dowler has not objected to the Magistrate Judge's factual summary of the case as set forth on pages one through nineteen of the report, the Court adopts the Magistrate Judge's findings. The Magistrate Judge's uncontested summary of the case is as follows:

### I. PROCEDURAL HISTORY

On March 19, 2009, Plaintiff filed applications for POD, DIB and SSA, alleging a disability onset date of November 1, 2003. (Tr. 22.) After the applications were denied initially and upon reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id*.) An ALJ conducted a hearing on July 6, 2011. (*Id*.) In a January 17, 2012 decision the ALJ found that Plaintiff was not disabled. (Tr. 22-35.) On March 23, 2013, the Appeals Council declined to review the ALJ's decision, and that decision became the Commissioner's final decision. (Tr. 1.)

On April 24, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this matter. (Doc. Nos. 20, 21.)[1] Plaintiff asserts that the ALJ erred in concluding that Plaintiff's impairments did not satisfy the requirements of Listing 1.04C of the Listings of Impairments ("the Listings"), and that there is insufficient evidence to support various aspects of the ALJ's decision.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was 40 years old on the alleged disability onset date. (Tr. 34.) He had at least a high school education and is able to communicate in English. (*Id*.) Plaintiff had past relevant work as an electrical maintenance worker, maintenance worker and stove assembler. (*Id*.)

### B. Medical Evidence[2]

#### 1. Plaintiff's Providers

On October 31, 2002, Plaintiff arrived at the emergency department at Grady Memorial Hospital, complaining that he had fallen off of a 12-foot ladder after the ladder struck a 220-volt electrical box. (Tr. 346.) He reported landing on his back. (*Id*.) A CT scan revealed an L1 compression fracture that "significantly compromis[ed] the spinal canal, as well as a fracture of the anterior posterior

---

[1] On April 24, 2013, the undersigned United States magistrate judge issued an Initial Order in this case, which instructed each party to file a pleading captioned either "Plaintiff's Brief on the Merits" or "Defendant's Brief on the Merits," and which limited those briefs to 20 pages. (Doc. No. 7 at 2-3.) On October 25, 2013, Plaintiff filed a 28-page document captioned "Plaintiff's Statement of Errors." (Doc. No. 20.) Thereafter, Defendant filed a Brief on the Merits that responded to the arguments raised in Plaintiff's Statement of Errors, and which complied with page limitation set forth in the Initial Order. (Doc. No. 21.) Plaintiff's counsel is reminded that, in future cases, counsel must comply with the undersigned's Initial Order.

[2] In addition to his physical impairments, Plaintiff alleged disability on the basis of a mood disorder, and the administrative transcript contains medical evidence related to this impairment. The ALJ determined that Plaintiff's mood disorder was not severe. (Tr. 25.) Plaintiff does not challenge this conclusion in this Court.

3

element of Plaintiff's L2 vertebrae, and Plaintiff complained of numbness in his lower extremities. (Tr. 348, 357-58, 360) He was transferred to Grant/Riverside Methodist Hospital for assessment by a neurosurgeon. (Tr. 348.)

After his transfer, Plaintiff was assessed by William R. Zerick, M.D., who diagnosed him with compression fractures of L1 and L2. (Tr. 373.) Plaintiff remained in the hospital until November 4, 2002, when Dr. Zerick discharged him with instructions to wear a clamshell brace when out of bed; to avoid driving, lifting greater than 15 pounds and exerting himself; and to use a wheeled walker at home. (*Id*.) Dr. Zerick noted that scans revealed no evidence of spinal cord compression or central canal stenosis, and that a neurosurgeon had concluded that there was no need for surgical intervention. (Tr. 374.)

On December 10, 2002, Dr. Zerick examined Plaintiff, noting that Plaintiff had "some mild left compromise but no kyphotic deformity." (Tr. 371.) An MRI showed no changes in Plaintiff's back. (*Id*.) Plaintiff complained of back pain and Dr. Zerick prescribed Lortab and instructed him to remain in the brace. (*Id*.) On February 11, 2003, Dr. Zerick noted that Plaintiff was "neurologically intact" and started Plaintiff on physical therapy, with the expectation that Plaintiff would be removed from the brace. (Tr. 369.) Plaintiff complained to Dr. Zerick that the doctor "had never offered him any help," and Dr. Zerick explained that "we have imaged him three times and each time his MRI does not show any change to his L1 burst fracture and there was no need for surgery." (Tr. 370.)

On March 31, 2003, Julie Chen, M.D., examined Plaintiff with reference to his complaints of low back pain. (Tr. 425-26.) She noted his complaints of severe pain that radiated into his hips and lower extremities, as well as cramping and muscle spasms. (Tr. 425.) Her review of a November 2002 MRI revealed mild loss of height of Plaintiff's L2-L1, without any evidence of cord compression or spinal canal stenosis. (Tr. 426.) Dr. Chen diagnosed Plaintiff with discogenic low back pain secondary to his compression fracture, and bilateral lower extremity radiculitis. (*Id*.) She recommended a medication regimen of morphine and muscle relaxants. (*Id*.)

On May 12, 2003, Dr. Zerick observed that Plaintiff had "never shown any significant neural compromise." (Tr. 368.) He noted that Plaintiff was improving with physical therapy and hydrotherapy, but opined that Plaintiff was "on a tremendous phenomenal amount of narcotics" and recommended that Plaintiff "try cutting back on some of this." (*Id*.) A scan of Plaintiff's lumbar spine on that date revealed "minimal depression with associated sclerosis, involving the superior endplate of L1 and L2," resulting in a 10% to 20% loss of height of the anterior portion of the L1 vertebral body. (Tr. 469.) On October 21, 2003, Dr. Zerick released Plaintiff to the care of his family physician, noting that, at this point, Dr. Zerick was "really not doing anything for him." (Tr. 367.)

In December 2003, Riverside Family Practice ("Riverside") physician Kevin Haney, M.D., described Plaintiff as compliant with all recommended therapies, but noted that Plaintiff was not able to adequately participate in physical therapy due to pain. (Tr. 430.) He noted that Plaintiff had regressed in his range of motion, pain

4

control and activities of daily living.  (*Id.*)  In April 2004, Dr. Haney opined that, while Plaintiff was not improving at that time, the lack of progress was because the amount of treatment permitted by the Bureau of Workers Compensation ("BWC") was not sufficient.  (Tr. 424.)  Dr. Haney stated that Plaintiff's condition would not result in permanent total disability, but, rather, that "with physical therapy and pain management," Plaintiff would recover.  (*Id.*)

    A January 14, 2004 scan of Plaintiff's spine revealed mild to moderate encroachment upon the central spinal canal at L1 and L2.  (Tr. 476.)

    On May 25, 2004, Plaintiff returned to Dr. Zerick, who declined to continue treating Plaintiff "because of [Plaintiff and his wife's] consistently rude behavior to [his] staff, as well as" to Dr. Zerick.  (Tr. 366.)

    On June 25, 2004, Plaintiff was examined by Shawn Howerton, M.D., at Riverside.  (Tr. 458.)  Plaintiff reported that the physical therapy was helping, and that he was able to walk short distances.  (*Id.*)  He complained of pain, but described it as well controlled, and tenderness and swelling.  (*Id.*)  Dr. Howerton prescribed morphine, pain patches and a muscle relaxant, as well as over-the-counter pain medications.  (*Id.*)  Plaintiff made similar reports in July 2004.  (Tr. 378.)  On August 20, 2004, Plaintiff reported that his posture had improved and that his pain continued, but was stable.  (Tr. 458.)  He felt that physical therapy continued to help with his pain and strength.  (*Id.*)  On September 11, 2004, Plaintiff reported that aquatic therapy was helping with his pain, but reported intermittent back swelling.  (Tr. 457.)  Dr. Howerton continued Plaintiff on his medications and water therapy.  (*Id.*)

    On September 16, 2004, Robert W. Stephenson, D.O., examined Plaintiff at the request of the BWC.  (Tr. 413-15.)  He noted that Plaintiff's gait was "slow and hesitant" and that Plaintiff was using a walker.  (Tr. 414.)  Physical examination revealed tenderness along Plaintiff's right side from T8 to L4, and 5 out of 5 strength in his lower extremities.  (*Id.*)  Dr. Stephenson opined that Plaintiff had attained maximum medical improvement with a conservative course of treatment.  (*Id.*)  He concluded that Plaintiff could return to work in a "sedentary, sit-down position" with only occasional lifting of up to 10 pounds; no bending, twisting at the wait, squatting, climbing or crawling; and with the opportunity to frequently change positions.  (Tr. 415.)

    On November 4, 2004 Plaintiff told Dr. Howerton that he had improved with physical therapy and that his back pain was stable.  (Tr. 454.)  On December 2, 2004, Plaintiff reported that his wife had left him and that his pain had increased.  (Tr. 455.)  He felt that physical therapy was going well and that it had improved his range of motion.  (*Id.*)  Plaintiff had obtained his drivers license.  (*Id.*)  Dr. Howerton continued Plaintiff on pain patches, morphine and the muscle relaxant.  (*Id.*)

    On December 8, 2004, Dr. Howerton authored a letter objecting to Dr. Stephenson's opinion that Plaintiff had attained maximum medical improvement.  (Tr. 416.)  He observed that Plaintiff's physical therapy notes revealed that Plaintiff had been making "steady improvement" in physical therapy, and that Plaintiff was

then attempting to become strong enough to drive. (*Id.*) Dr. Howerton opined that Plaintiff could return to work at a sedentary position with no lifting more than 10 pounds, and no bending, twisting at the waist, squatting, climbing or crawling. (*Id.*)

On December 28, 2004, Plaintiff arrived 30 minutes late for an appointment at Riverside and became hostile and refused to leave when he was told that he could not be seen on that date. (Tr. 452.) Plaintiff reported that he was out of pain medication and Dr. Howerton prescribed a one-week supply of Plaintiff's medications. (*Id.*) On January 5, 2005, Dr. Howerton reported that Plaintiff had been abusive and hostile toward Riverside staff and physicians. (Tr. 453.) Plaintiff accused Riverside of not helping him with his back injury, and of causing him to be unable to work due to restrictions on his activity and exertion levels. (*Id.*) Plaintiff claimed to be homeless, but a friend who was with him indicated that Plaintiff was living with him. (*Id.*) Dr. Howerton warned Plaintiff that further outbursts would result in him being discharged from Riverside's care, and continued his medications. (*Id.*)

On February 2, 2005, Plaintiff reported that he was homeless, and was looking for work but no one would hire him. (Tr. 450.) Plaintiff claimed to be feeling stronger, but also reported using a cane occasionally. (*Id.*) On March 8, 2005, Plaintiff reported to Dr. Howerton that he had been out of his pain medications for three days. (Tr. 451.) Plaintiff was walking with a cane and stated that he could drive. (*Id.*) He reported having two job interviews. (*Id.*) Dr. Howerton instructed Plaintiff to continue or restart physical therapy, and prescribed pain patches, morphine and a muscle relaxant. (*Id.*)

On April 4, 2005, Plaintiff reported that he was "progressing" in aqua therapy and was walking in the pool. (Tr. 448-49.) He continued to use morphine and pain patches. (Tr. 449.) On May 24, 2005, Plaintiff reported that he was living in an upstairs apartment and that his pain had increased. (Tr. 446.) He stated that physical therapy was helpful. (*Id.*)

In a June 20, 2005 letter to the BWC, Dr. Howerton stated that Plaintiff had made progress in physical therapy, having progressed from aqua to land-based therapy, and moved from using a walker to using a cane. (Tr. 406.) Dr. Howerton opined that Plaintiff could work in a sedentary position without foot controls or heavy lifting, and that would not require him to sit or stand for more than two hours without a break or a change in position. (*Id.*)

On June 23, 2005, Plaintiff reported that he was walking short distances without his cane. (Tr. 447.) Dr. Howerton instructed Plaintiff to continue his physical and aqua therapy and to begin weight training. (*Id.*) He continued Plaintiff's morphine and pain patches. (*Id.*)

On July 8, 2005, William R. Fitz, M.D., examined Plaintiff at the request of the BWC. (Tr. 402-04.) He noted that Plaintiff complained of pain rated at an 8 out of 10 in the lower lumber region, and swelling in his left thigh. (Tr. 403.) Plaintiff used a cane during the examination, and was unable to walk on his toes due to pain. (*Id.*) In a report of work ability, Dr. Fritz opined that Plaintiff could: occasionally

6

lift and carry up to 10 pounds, stand/walk and sit; but could never: bend, twist/turn, reach below the knee, push/pull, squat/kneel, or lift above his shoulders. (Tr. 405.)

On July 22, 2005, Plaintiff was examined by Riverside physician Jason M. Winterhalter, M.D., who noted that Plaintiff had strength of 5 out of 5 in his right lower extremity and 4 out of 5 in his left. (Tr. 444.) Plaintiff complained of pain in his legs rated at 9 out of 10. (*Id*.) Plaintiff claimed that the dosage of his pain patches was not strong enough and requested a higher dosage. (*Id*.) Dr. Winterhalter continued Plaintiff's medications as before. (*Id*.) In an August 3, 2005 letter to an attorney, Dr. Winterhalter opined that Plaintiff had made progress in his strength and flexibility through physical therapy. (Tr. 400.) He opined that "at some point," Plaintiff would be capable of working in a sedentary job with no foot controls, heavy lifting, bending, twisting, squatting or climbing, and that would permit him to change positions from standing to sitting every two hours. (*Id*.)

On August 17, 2005, Plaintiff reported to Dr. Winterhalter that he had run out of his pain medication and was "withdrawing." (Tr. 445.) An examination revealed a negative straight leg raise, as well as strength of 5 out of 5. (*Id*.) Dr. Winterhalter instructed Plaintiff to continue physical and aqua therapy, and continued Plaintiff's medications. (*Id*.) He advised Plaintiff to take his medication as scheduled, and opined that Plaintiff was "poss[ibly] malingering." (*Id*.) He referred Plaintiff to a pain management physician to be assessed for pain management injections. (*Id*.)

On October 14, 2005, Dr. Winterhalter rated Plaintiff's lower extremity strength at 5 out of 5 on the right and 4 out of 5 on the left. (Tr. 440.) Plaintiff was able to stand unsupported and flex at the hips. (*Id*.) Plaintiff agreed to sign a "pain contract," but declined to give a urine sample. (*Id*.)

On November 4, 2005, Ephraim K. Brenman, D.O., examined Plaintiff on Dr. Winterhalter's referral. (Tr. 389-92.) He noted that Plaintiff was in "severe distress" with an antalgic gait and was using a cane. (Tr. 391.) His physical exam revealed lumbar tenderness, difficulty getting up into a neutral position, and pain in the lumbosacral region. (*Id*.) After reviewing MRI scans from 2002 and November 2003, Dr. Brenman diagnosed Plaintiff with chronic compression fracture of L1 and L2 but more at L1 with possible cord impingement; possible lumbar facet syndrome; and possible lumbar nerve root irritation. (*Id*.)

Later in November 2005, Riverside informed Plaintiff that he could no longer receive treatment there, noting that he had tested positive for marijuana and been abusive to the physicians and staff. (Tr. 394, 437-39.)

On December 14, 2005, Plaintiff presented to the emergency department at Marion General Hospital ("MGH"), complaining of back pain and reporting that he was out of his pain medication. (Tr. 576.) Physical examination revealed tenderness, but good strength and sensation. (*Id*.) The emergency department physician contacted Dr. Winterhalter, who informed her of Plaintiff's discharge from Riverside. (*Id*.) The physician informed Plaintiff that he would not receive

any narcotics from the emergency room, and referred Plaintiff to pain management. (*Id.*)

In January 2006, Dr. Brenman noted that Plaintiff had strength of 5 out of 5 in his lower extremities, a forward flexed posture and an antalgic gait. (Tr. 498.) Dr. Brenman recommended that Plaintiff receive medial branch blocks. (*Id.*)

On August 28, 2006, David Smith, M.D., noted that Plaintiff – who had recently spent six months in prison – was deconditioned, but wanted to return to work. (Tr. 485.) He decided to assess Plaintiff's physical limitations and consider sending him to vocational rehabilitation. (*Id.*) Plaintiff complained of cramping and aching in his legs at night, and Dr. Smith prescribed Lyrica. (*Id.*) On September 19, 2006, Dr. Smith observed that Plaintiff was ready to go into work conditioning and was "anxious to return to work in some capacity." (Tr. 598.) Dr. Smith diagnosed Plaintiff with restless leg syndrome. (*Id.*) On October 3, 2006, Plaintiff reported to Dr. Smith that he was experiencing numbness and ache in his back and legs, but had recently driven down to Tennessee after his son was murdered there. (Tr. 598.) On October 13, 2006, Dr. Smith noted that Plaintiff as walking with a cane and complaining of bilateral leg pain. (Tr. 489.) Plaintiff was undergoing aquatic therapy, and was walking back and forth to his physical therapy appointments. (*Id.*) Dr. Smith recommended that Plaintiff begin land-based therapy as well. (*Id.*)

On November 3, 2006, Plaintiff reported to Dr. Smith that he had a constant ache in his legs. (Tr. 601.) On November 12, 2006, Plaintiff reported to the MGH emergency department, complaining of chronic low back pain. (Tr. 574.) The emergency department physician noted diffuse tenderness and paraspinal muscle spasm. (*Id.*) The physician diagnosed Plaintiff with exacerbation of his back pain, and Plaintiff was given injections of pain and anti-inflammatory medications. (*Id.*)

On December 15, 2006, Dr. Smith noted that Plaintiff was "getting work hardening," and noting "some progression." (Tr. 605.) Plaintiff was "walking better, stronger and more upright," and using the cane for distances. (*Id.*) Dr. Smith opined that Plaintiff "needs to continue to push himself." (*Id.*) on February 16, 2007, Dr. Smith noted that Plaintiff "continues to gain ground with . . . strength and stability with the [physical] therapy." (Tr. 607.)

On March 8, 2007, Plaintiff reported to an MGH emergency department physician that he was having back spasms and pain in his lumbar region. (Tr. 573.) Physical examination revealed bilateral paraspinal muscle tenderness to palpitation, as well as tightness and spasms. (*Id.*)   The physician diagnosed Plaintiff with exacerbated chronic back pain and prescribed pain medication and a muscle relaxant. (*Id.*)

On March 13, 2007, Christopher D. Cannell, M.D., performed a physical disability examination at the request of the BWC. (Tr. 650-51.) Dr. Cannell concluded that Plaintiff had reached maximum medical improvement. (Tr. 652.) He opined that Plaintiff had received reasonable, conservative care for the injuries he sustained in his fall in 2002. (*Id.*) Dr. Cannell concluded that Plaintiff could return to work in a sedentary position with the following restrictions:

lifting/carrying five pounds frequently and 10 pounds occasionally; occasionally bending, stooping, squatting kneeling, crouching and stair climbing; no crawling or ladder climbing. (*Id*.)

A March 14, 2007 scan of Plaintiff's lumbar spine showed no changes when compared to earlier scans. (Tr. 628.) The scan revealed disc protrusions at T12-L1, but no significant central canal stenosis or neural foraminal narrowing on either side. (*Id*.)

On March 20, 2007, Plaintiff reported to Dr. Smith that he had taken time off from his physical therapy and working conditioning. (Tr. 608.) Dr. Smith noted that a recent MRI showed no new findings and instructed Plaintiff to return to therapy and work conditioning. (*Id*.) On April 17, 2007, Dr. Smith notified Plaintiff that the BWC had concluded that he had reached maximum medical improvement. (Tr. 609.) Dr. Smith noted a decrease in the range of motion with flexion, extension and lateral bending and rotation. (*Id*.) Dr. Smith recommended that Plaintiff receive assistance in looking for a job, as well as vocational rehabilitation. (*Id*.) On April 23, 2007, Plaintiff continued to complain of pain in his back. (Tr. 610.) Dr. Smith opined that Plaintiff had permanent restrictions that would need to be documented with respect to his ability to work. (*Id*.)

Plaintiff returned to MGH on April 19, 2007, complaining of back pain. (Tr. 571.) The emergency department physician noted that Plaintiff had muscle spasms of his paravertebral muscles, but observed that he had a good range of motion. (*Id*.) She declined Plaintiff's request for pain patches, and prescribed injections of pain and anti-inflammatory medications. (*Id*.) On May 28, 2007, Plaintiff presented to the MGH emergency department, complaining of pain in his mid to lower back. (Tr. 570.) The physician noted that Plaintiff was walking with a cane. (*Id*.) The physician diagnosed Plaintiff with chronic back pain, and Plaintiff received injections of pain medication and a muscle relaxant. (*Id*.)

On May 31, 2007, occupational therapist Tanya Kimball Vela completed a functional capacity evaluation of Plaintiff. (Tr. 635-41.) She concluded that Plaintiff could: infrequently lift 22.5 pounds, occasionally lift 17.5 pounds and frequently lift 10 pounds from 12 inches above the ground to his waist; infrequently lift 22.5 pounds, occasionally lift 17.5 pounds and frequently lift 12 pounds from his waist to his shoulder; infrequently lift 15 pounds, occasionally lift 10 pounds and frequently lift 5 pounds over his head; infrequently carry 10 pounds and occasionally carry 5 pounds 30 feet; and push/pull 35 pounds infrequently. (Tr. 635.) She concluded that Plaintiff could: constantly sit; frequently static bend or stoop, squat, crouch and reach overhead; and occasionally stand, walk, climb stairs, bend repeatedly, squat or crouch repeatedly, and kneel. (*Id*.) She opined that Plaintiff was limited to sedentary to light work, and had good sitting tolerance and upper body strength. (Tr. 635-36.)

On June 13, 2007, Dr. Smith noted that Plaintiff was "doing quite well," and, given that he had recently undergone a functional capacity evaluation, was "pleased to get back into the work force and to get his life back." (Tr. 612.) On July 30, 2007, Dr. Smith noted that Plaintiff was "doing pretty well" and was looking for a

job.  (Tr. 614.)  Plaintiff was walking more and "rarely" used the cane.  (*Id*.)  In a work ability report prepared on that date, Dr. Smith opined that Plaintiff could return to work with the following permanent restrictions: never lifting more than 20 pounds; occasionally lifting 11 to 20 pounds and frequently lifting up to 10 pounds; occasionally bending, twisting, turning, reaching below his knees, pushing/pulling, squatting/kneeling, and standing/walking.  (Tr. 632.)  Dr. Smith noted that it was "ok[ay] to limit work week to 30 h[ou]rs [per] w[ee]k."  (*Id*.)

On November 16, 2007, Plaintiff reported to Dr. Smith that his back was "knotted and swollen," and that he had a lot of stress.  (Tr. 617.)  Dr. Smith noted that Plaintiff walked with an antalgic gait and was using his cane.  (*Id*.)  Examination revealed a decreased range of motion in the thoracic spine.  (*Id*.)  Dr. Smith continued Plaintiff's Lyrica and instructed him to stretch and use heat.  (*Id*.)  He prescribed pain pills and a muscle relaxant.  (*Id*.)

On December 14, 2007, Dr. Smith noted that Plaintiff was "doing fairly well" and "look[ed] quite good."  (Tr. 618.)  Plaintiff reported that he was using his cane, but only for long distances, and that he had reduced his use of pain medication.  (*Id*.)  On January 8, 2008, after Plaintiff reported that he had completed vocational rehabilitation and was not able to find a job, Dr. Smith opined that Plaintiff should apply for permanent partial disability and social security benefits.  (Tr. 619.)  In January and February 2008, Plaintiff reported to Dr. Smith that he was walking to his job search sites, and experiencing a lot of pain in his back.  (Tr. 620-21.)  In March 2008, Dr. Smith opined that it was "unlikely that [Plaintiff] will be employed given the degree of his limitations."  (Tr. 622.)  In April 2008, Dr. Smith noted that Plaintiff's request for vocational retraining had been denied.  (Tr. 623.)

In May 2008, Plaintiff reported to Dr. Smith that he was walking everywhere, and using a cane only for long distances, but still experienced pain with prolonged walking.  (Tr. 624.)  Plaintiff acknowledged that he had improved, but was having problems finding work.  (*Id*.)  Plaintiff made similar reports in June and July 2008.  (Tr. 625, 626.)

A March 5, 2010 MRI of Plaintiff's lumbar spine revealed moderate degenerative disc disease developing at L5-S1, and mild degenerative disc disease at L4-L6.  (Tr. 760.)  MRIs of Plaintiff's thoracic and cervical spines on that same date revealed moderate degenerative disc disease at C5-C6 and C6-C7, with "fairly significant" foraminal narrowing and mild associated central canal stenosis.  (Tr. 758, 759.)

On August 26, 2010, Albert L. Timperman, M.D., a neurologist, examined Plaintiff, noting his complaints of pain in his lower back and lower extremities.  (Tr. 774-77.)  He described Plaintiff's gait as shuffling, and noted that Plaintiff had difficulty walking on his heels.  (Tr. 774-75.)  Dr. Timperman opined that Plaintiff's pain was related to the disc bulge at L5-S1, rather than his compression fractures.  (Tr. 775.)  He determined that Plaintiff should undergo epidural steroid injections.  (Tr. 776.)

**2. Agency Reports and Assessments**

On August 18, 2009, agency consultant Mei-Chiew Lai, M.D., performed a disability evaluation on Plaintiff. (Tr. 666-69.) She noted Plaintiff's complaints of constant pain in the lower back and lower extremities, which intensified if he remained in one position for too long. (Tr. 666.) Plaintiff indicated that he used a cane when walking long distances. (*Id*.) Dr. Lai's exam revealed no muscle weakness in Plaintiff's lower extremities, with good muscle mass. (Tr. 667.) Plaintiff's range of motion in his lumbar spine was limited, and Plaintiff complained that the range of motion test aggravated his pain. (*Id*.) Dr. Lai noted tenderness in Plaintiff's lumbar spine. (Tr. 668.)

Dr. Lai indicated that Plaintiff walked without any assistive device, had good balance and did not limp. (Tr. 668.) Plaintiff was able to heel walk and squat, but complained of pain during those tests. (*Id*.) He could walk heel-to-toe on a straight line, but was "slightly unsteady." (*Id*.) Dr. Lai diagnosed Plaintiff with chronic low back pain from the compression fracture and degenerative disc and joint disease, as well as a history of electrocution. (*Id*.) Dr. Lai opined that Plaintiff could work with the following restrictions:

> [T]his patient is not able to be in one position or one activity too long at a time. Probably, the patient is able to sit for on hour at a time, stand for about one hour at a time. Able to be up on the feet for about two hours at a time. May be able to lift up to 20 to 30 pounds once in a while. Avoid frequent bending or reaching to the floor or lifting from the floor. Totally no restriction for any upper extremity functional activity.

(Tr. 669.)

On October 14, 2009, agency consulting physician Willa Caldwell, M.D., performed a physical residual functional capacity ("RFC") assessment. (Tr. 682-89.) She opined that Plaintiff could: lift 20 pounds occasionally and 10 pound frequently; stand and/or walk and sit for about six hours in an eight-hour workday, with normal breaks; frequently climb ramps/stairs, balance, stoop, kneel and crouch; and occasionally climb ladders/ropes/scaffolds, and crawl. (Tr. 683-85.) Dr. Caldwell opined that Plaintiff's complaints regarding the intensity of his symptoms were not credible, noting that he was taking only over-the-counter medications to control his pain. (Tr. 687.) She also opined that Plaintiff did not require an ambulatory aid. (*Id*.) Her RFC accounted for Plaintiff's complaints of pain. (*Id*.)

On May 18, 2010, agency consulting physician Leigh Thomas, M.D., reviewed medical evidence received after Dr. Caldwell's October 2009 RFC assessment, opined that the new evidence did not alter the RFC, and affirmed Dr. Caldwell's opinion. (Tr. 780.)

**C. Hearing Testimony**
    **1.    Plaintiff's Testimony**

At his July 6, 2011 administrative hearing, Plaintiff testified as follows:

11

After his fall in 2002, he "c[a]me home in a hospital bed and in a wheelchair," and "they said, ['] well you probably won't get out of that wheelchair,['] but I did make it to a walker." (Tr. 49.) He used a wheelchair for "six months to a year," and then used a walker for four years. (*Id*.) At the time of the hearing, Plaintiff still used the walker when it rained and in the winter. (*Id*.) He used the cane otherwise. (Tr. 49-50.)

Plaintiff experienced constant pain, knotting and swelling in his back. (Tr. 50.) His pain radiated throughout his back and extremities, and interfered with his ability to sleep. (Tr. 50-51.) His hands frequently went numb and tingled. (Tr. 51.) Since the date of his accident, he could stand for no longer than 15 minutes with his cane, and could not walk further than a block without stopping. (Tr. 53-54.) He had undergone physical therapy in the time since his accident, but it was not helpful. (Tr. 55.) Physicians had prescribed steroid injections, but he had not undergone any of them. (*Id*.)

Plaintiff felt that he could lift and carry 20 pounds without significantly increasing his pain. (Tr. 56.) He had problems walking on rough services or gravel, and had to lean on railings to travel up flights of stairs. (Tr. 56-57.) He needed to change positions every 15 or 20 minutes. (Tr. 66-67.) At the time of the hearing, Plaintiff was taking a prescription pain medication and Lyrica. (tr. 69-70.)

Plaintiff lived with his girlfriend and her two children in a duplex apartment. (Tr. 57-58.) He drove his car about 50 miles each week, generally to pick up his girlfriend's parents to attend church, which he attended also, two times each week. (Tr. 59, 65.) He drove his girlfriend to the grocery store, but generally waited outside for her. (Tr. 64-65.) He washed the dishes while sitting in a chair in front of the sink, but generally did not do any other housework. (Tr. 59) He spent his time each day reading the Bible, watching television and talking to his girlfriend's children. (Tr. 59-60.)

### 2. VE Testimony

The ALJ described the following hypothetical individual of Plaintiff's age and with Plaintiff's work history and education to the VE:

> Limited to the light exertional level; would not be able to climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs; could occasionally stoop, kneel, crouch and crawl; and frequently balance.

(Tr. 72.) The VE opined that the hypothetical individual could not perform any of Plaintiff's past work, but concluded that the individual could perform work as a production assembler and unskilled cleaner. (*Id*.)

### III. DOWLER'S ARGUMENT

In his objections to the Magistrate Judge's report, Dowler argues that the administrative

law judge (ALJ) erred by failing to give the opinion of his treating physician, Dr. David Smith,

12

controlling weight. The Court concludes that the Commissioner's evaluation of Dr. Smith's opinion is supported by substantial evidence and is not erroneous as a matter of law.

The controlling decision on this issue is *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011). In *Cole*, the court noted that the Commissioner has elected to impose certain standards on the treatment of "medical source evidence." *Cole*, 661 F.3d at 937; *see also* 20 C.F.R. § 404.1502. Under what is commonly known as the "treating physician rule," *Cole*, 661 F.3d at 937, the Commissioner requires an ALJ to give a treating physician's opinion controlling weight if the opinion "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating physician's opinion controlling weight, the ALJ must then balance the following factors to determine what weight to give the opinion: 1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record as a whole; and 5) the specialization of the treating source. *Cole*, 661 F.3d at 937 (citations omitted).

*Cole* noted that the Commissioner requires decision makers to "'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Id*. (quoting 20 C.F.R. § 404.1527(d)(2)). The reasons must be supported by the evidence and must be sufficiently specific to inform any subsequent reviewer of the weight given to the treating source's medical opinion, along with the reasons for that weight. *Id*. (citation omitted).

The ALJ in *Cole* found that a Dr. Vishnupad, one of Cole's several physicians, was Cole's treating psychiatrist. The ALJ accepted the doctor's diagnosis of major depression. The court

noted that although the ALJ deemed the doctor's medical opinion to be deserving of controlling weight, the ALJ failed to explicitly address the weight given. *Id.* at 938. After accepting Dr. Vishnupad's diagnosis, the ALJ rejected the conclusions contained in the doctor's residual functional capacity assessment concerning the severity of Cole's impairments as they relate to work. The court found that the ALJ's failure to assign a specific weight to Dr. Vishnupad's assessment constituted reversible error. *Id.*

In his opinion, the ALJ stated Dr. Smith felt that Dowler was unable to work for a period of time. The ALJ stated that although he considered Dr. Smith's disability opinion, he gave the opinion no weight because disability determinations are the responsibility of the Commissioner. This determination is correct. An opinion regarding disability is a matter reserved for the Commissioner. Such an opinion by a treating physician is not entitled to "any special significance." 20 C.F.R. § 404.1527(d)(3); *Warner v. Comm'r of Soc. Sec.* 375 F.3d 387, 390 (6th Cir. 2004) (recognizing the determination of disability to be the prerogative of the Commissioner, not the treating physician). Therefore, the ALJ did not err in refusing to give weight to Dr. Smith's opinion that Dowler was disabled.

Dr. Smith found Dowler could frequently lift and carry up to ten pound and occasionally lift and carry twenty pounds. Dr. Smith also found that Dowler could occasionally bend, twist, reach below knee level, push, pull, squat, kneel, stand, walk, and continuously sit. The ALJ stated he gave this opinion some weight as the exertional lifting levels were supported by the evidence in the record. Regarding the other limitations, the ALJ found Dr. Smith failed to provide specific functional limitations, providing no assistance in determining Dowler's residual functional capacity. (Doc. 18, p. 38). The Court notes that Dr. Smith's bending and lifting restrictions were

similar to the findings of Dr. Mei-Chiew Lai, a consultative physician, whose residual functional capacity assessment the ALJ gave great weight. (Doc. 18, pp. 35, 37). Because the ALJ correctly disregarded Dr. Smith's opinion that Dowler was disabled, *Warner*, 375 F.3d at 390, and explained how he weighed Dr. Smith's various findings, *Cole*, 661 F.3d at 937, the ALJ's decision is supported by substantial evidence.

### IV. CONCLUSION

Accordingly, the Magistrate Judge's report and recommendation is adopted and the Commissioner's denial of Dowler's applications for social security disability insurance benefits and for supplemental security income benefits is affirmed.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE